**GILL SAVINGS ASSOCIATION, Appellant,**

v.

**CHAIR KING, INC., Appellee.**

**No. C14–88–0351–CV.**

Court of Appeals of Texas, Houston (14th Dist.).

Dec. 21, 1989.

Rehearing Denied Jan. 18, 1990.

Paul Curl, San Antonio, Joanne Vorpahl, Houston, Thomas B. Black, San Antonio, for appellant.

Dennis G. Herlong, Houston, for appellee.

Before PAUL PRESSLER, CANNON and ELLIS, JJ.

## OPINION

PAUL PRESSLER, Justice.

Appellee sued for damages resulting from its eviction from the West Oaks Central Shopping Center. Following a non-jury trial, the trial court awarded the appellee actual and punitive damages and attorney's fees. We affirm on liability, modify the award of attorney's fees and reverse and remand on damages.

Since the parties disagree as to the facts, they are reconstructed allowing for both versions. Chair King sells pool, patio, dinette and bar furniture. In May 1985 the

company opened its fourth Houston store in West Oaks Central Shopping Center, which was owned by Westoaks Central, Ltd. and financed by Gill Savings Association. N.B.C. Bank–Heights had financed Chair King's inventory and signed an agreement with Westoaks subordinating its landlord lien to N.B.C. Bank–Heights' first lien on all of the inventory and fixtures. This subordination agreement required that the bank be given a copy of any notice of lease default by Chair King in order to give the bank the option of curing the default.

West Oaks Central was newly constructed, and there were difficulties resulting from construction defects, the maintenance and the dearth of tenants. In January 1986 Westoaks defaulted on its loan and assigned the rents to Gill Savings. Gill Savings essentially took over the management of the center and foreclosed on it in October 1987. Shortly after moving into the center, Chair King submitted a "punch list" of defects, most of which it claims were never remedied. After repeated requests for repairs, particularly a ladder allowing access to the roof in order to service the air conditioners, Chair King notified Gill Savings and Westoaks that it considered the lease to have been breached and that it would, therefore, withhold rent. Chair King offered to place the rent into an escrow account. Gill Savings did not then demand the rent or evict Chair King but, instead, agreed to the escrow arrangement. For reasons that are disputed, the escrow account was never opened.

Meanwhile, Gill Savings was negotiating to rent space in the center to Toys 'R' Us, a national toy store chain, which evidently had specific requirements that could be met only by Chair King's space. Gill Savings contacted Chair King's president, Marvin Barish, to see if he were interested in moving the store to a comparable space in the center. Discussions were continuing when, on April 8, 1987, Westoaks sent a demand letter for the delinquent rent to Chair King. Gill Savings allegedly instigated the letter, and its counsel prepared it. Westoaks did not send a copy to N.B.C. Bank–Heights as required by the subordination agreement. Barish claims he was told by

Gill Savings not to worry about the letter. On April 20th, representatives from Gill Savings met with Barish and his son to discuss the terms of the proposed move, which would include the abatement of the delinquent rent, a rental rate of fifty cents per square foot, and payment of both moving expenses and finishing costs. Given a choice between spaces previously occupied by W. Bell and Denhome, Chair King chose the W. Bell space.

The Gill Savings' representatives, Jae Carpenter and Jonathan Shapiro, discussed the proposed terms with their loan committee. They then called Barish and told him their "best deal" was the Denhome space at sixty-five cents per square foot and a slightly lower amount than requested for the tenant finish. Barish rejected those terms. As he was leaving town for a week, he understood that Carpenter would continue talking with the loan committee. Carpenter maintains, however, that his final comment to Barish was that if the offer were unacceptable, other alternatives would have to be considered. Gill Savings then hired a moving company and evicted Chair King during the early morning hours of May 3rd, the day before Barish's return.

Upon his return, Barish obtained a temporary injunction requiring that his company be reinstated in its old space and that its inventory be returned. The inventory was not returned until May 26th, and some of it was lost or damaged. The store did not reopen until the 30th. Under the terms of the injunction, Chair King was ordered to move out permanently by September 1987. It has since been unable to open another store in the west Houston market.

Chair King thereupon sued Gill Savings for fraud, breach of contract and numerous other torts. The trial court found for Chair King and made extensive findings of fact and conclusions of law. Gill Savings' liability was assessed at $144,309 actual damages and $355,277 punitive damages. Gill Savings appeals the judgment on twelve points of error.

■ Many of Gill Savings' points of error challenge the trial court's findings of

fact and conclusions of law. The trial court's findings of fact are reviewable for legal and factual sufficiency of the evidence by the same standards which are applied in reviewing the legal or factual sufficiency of the evidence supporting a jury's answer to a jury question. *Okon v. Levy,* 612 S.W.2d 938, 941 (Tex.Civ.App.—Dallas 1981, writ ref'd n.r.e.). In a no evidence point of error, only the evidence and inferences that support the challenged finding will be considered, and all contrary evidence and inferences will be disregarded. *Davis v. City of San Antonio,* 752 S.W.2d 518, 522 (Tex.1988). In a factual sufficiency point of error, all of the evidence will be considered and the finding will be set aside only if the evidence is so weak or the finding so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *Garza v. Alviar,* 395 S.W.2d 821, 823 (Tex.1965). Conclusions of law drawn from the findings of fact are reviewed to determine their correctness. *Mercer v. Bludworth,* 715 S.W.2d 693, 697 (Tex.App.—Houston [1st Dist.] 1986, writ ref'd n.r.e.).

In its first point of error, Gill Savings argues that the eviction was valid, the alleged defects did not justify the withholding of rent, the eviction was not tainted with fraud or barred by estoppel and the related findings of fact and conclusions of law are not supported by the evidence.

This case began as a landlord/tenant dispute over certain alleged defects. The trial court found that there were numerous material defects in the leased premises and that these unrepaired defects made the "lease unsuitable for its intended purpose." Marvin Barish testified that after moving into the store, he submitted a list of fifteen problems, two of which were fixed during the next two years. He also identified several photos, taken two years after the store opened, of roof leaks, fallen ceiling tiles and roofing materials that had come through the ceiling. Continued lack of access to the air conditioning equipment on the roof as required by the Uniform Building Code was the last straw, and Barish notified West Oaks in May of 1986 that Chair King considered this a breach of the lease and would withhold rent until the ladder was provided. Late in May he wrote the management company, listing nine defects, including the access problem and leaks in the roof, air conditioners, side door and patio doors. Only the access problem was ever resolved. Chair King placed into evidence a Gill Savings internal memorandum dated January 27, 1987, in which someone sent to inspect the property detailed numerous problems with the center and stated that the general atmosphere was one of disaster. A February 11, 1987, market research report from an independent company, introduced to contradict the memorandum, stated only that the center was clean and had good eye appeal.

The manager of the West Oaks store corroborated Barish's testimony. He added that he was the one who cleaned up any water damage or tile that had fallen. At times it was quite messy because the tile would get saturated and fall "all over the place." He also stated that some furniture got "waterlogged" from the water upstairs.

 Barish's decision to stop paying rent brought matters to a head. It was also the basis for Chair King's estoppel and fraud claims. The requisites of promissory estoppel are: (1) a promise, (2) forseeability of reliance thereon by the promisor, and (3) substantial reliance by the promisee to his detriment. *English v. Fischer,* 660 S.W.2d 521, 524 (Tex.1983). The elements of fraud are: (1) that a material representation was made; (2) that it was false; (3) that when the speaker made it he knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) that he made it with the intention that it should be acted upon by the other party; (5) that the other party acted in reliance upon it; and (6) that he thereby suffered injury. *Stone v. Lawyers Title Ins. Co.,* 554 S.W.2d 183, 185 (Tex.1977).

 Instead of repairing the defects (although Gill Savings asserts some repairs were made and others were not the landlord's responsibility), demanding the rent or evicting Chair King according to the

terms of the lease, Jae Carpenter agreed to an offer to escrow the rent until the repairs were made. A signature card for an escrow account was mailed to the parties for signatures. However, the account was never opened. Barish maintained the card was incorrectly signed by the Gill Savings people and was supposed to be corrected. Jae Carpenter testified that Barish did not want to put the entire amount of money due into the escrow account.

Negotiations then began over the proposed move to another space in the center. Those were continuing when Chair King received the demand letter for the delinquent rent from Westoaks. Vincent Salvaggio, a principal in Westoaks, testified that he was at home ill during most of this period and that Jae Carpenter called and told him a letter needed to be written to Chair King asking them to give up the space. Carpenter testified that Gill Savings' attorneys actually prepared the letter because the Westoaks staff had been drastically reduced and because the attorney's fees for the letter would be paid by Gill Savings out of the assignment of rents account. Clearly, Gill Savings and Carpenter instigated the demand letter. Marvin Barish testified he was told by Carpenter not to worry about the letter. Gill Savings maintains, however, that Barish actually conversed with Jonathan Shapiro, who claims he did not tell Barish to ignore the letter.

Barish asserts that Carpenter and Shapiro agreed to certain terms, which he was led to believe needed only "rubber stamp" approval by the Gill Savings loan committee. Just before he left town, he called to check on the status of the deal and spoke to Shapiro. Barish told Shapiro to get his best offer and put it in writing and claims that Shapiro said he would do that. Barish was thus under the impression that negotiations would continue upon his return and had no idea that an eviction was in progress. Shapiro did not recall making that statement.

Several witnesses testified that Gill Savings directed the eviction, and it appears to have been carried out so as not to arouse Chair King's suspicion. Carpenter and Shapiro testified they thought that if Chair King were forewarned, the inventory would be moved out of reach, thus jeopardizing Gill Savings' position. Furthermore, NBC Bank–Heights was not given notice of the default as required by the subordination agreement. Obviously, had the rent been paid, Gill Savings would have been frustrated in its efforts to get Chair King out of the space. The move was critical because negotiations with Toys 'R' Us had progressed to the point that the latter had signed a lease for the Chair King space on April 24th (approximately eight days prior to the eviction). It is interesting to note that Toys 'R' Us had also drafted an indemnity agreement to protect itself in the event of any lawsuits involving Chair King. To all appearances, Gill needed Chair King out, and that was not being accomplished quickly enough.

Most of the witnesses at trial were interested parties who disagreed about the facts. In a non-jury case, the trial judge is the finder of fact. It was her responsibility to weigh the evidence and judge the credibility of the witnesses. The trial judge may accept or reject the testimony of any witness in whole or in part, and while an appellate court may not have reached the same findings, it may not substitute its judgment for that of the trial court. *Glassman and Glassman v. Somoza*, 694 S.W.2d 174, 178 (Tex.App.—Houston [14th Dist.] 1985, no writ). In this case, the judge found all the elements of fraud and estoppel. Given the standards by which we are to review her findings of fact and conclusions of law, there is sufficient evidence to support her conclusion that Chair King was entitled to recover on those claims. Therefore, point of error one is overruled.

In point of error two, Gill Savings complains of the trial court's failure to grant the damages sought in its counterclaim for rent and argues that there was either no evidence or no substantial evidence to support the findings of fact and conclusions of law relevant to this issue. Chair King asserted the following defenses regarding the counterclaim, and the trial court upheld them all: material breach of the lease,

breach of implied warranty of habitability, breach of express warranties, actual eviction, constructive eviction, fraud, waiver and estoppel. Gill Savings is estopped from asserting any right to rent as found by the trial court.

■ Estoppel is the effect of the voluntary conduct of a party whereby he is absolutely precluded, both at law and in equity, from asserting rights which might perhaps have otherwise existed, either of property, of contract, or of remedy, as against another person, who has in good faith relied upon such conduct, and has been led thereby to change his position for the worse, and who on his part acquires some corresponding right, either of property, of contract, or of remedy. *Finkelstein v. Southampton Civic Club*, 675 S.W.2d 271, 278 (Tex.App.—Houston [1st Dist.] 1984, writ ref'd n.r.e.) (quoting *Farmer v. Thompson*, 289 S.W.2d 351 (Tex.Civ.App.—Fort Worth 1956, writ ref'd n.r.e.)).

■ During the year in which Chair King withheld the rent, Westoaks and Gill Savings showed little interest in collecting it. The agreement to escrow rent was not executed. Although Gill Savings instigated the demand letter sent by Westoaks, there was testimony that Gill Savings told Chair King not to worry about it. Chair King was never told in plain language to pay up or get out. The loan committee even agreed at one point to a fifty percent abatement of the past due rent should Chair King move within the center. Furthermore, the ongoing negotiations concerning the move had the effect of lulling Marvin Barish into thinking Gill Savings wanted Chair King to remain in West Oaks Central. Indeed, he left town for a week never suspecting that Gill Savings was contemplating an eviction. Gill Savings' conduct caused Barish to remain at West Oaks Central and put his inventory in jeopardy, thinking that some resolution was forthcoming. Because of this conduct, Gill Savings relinquished its right to the rent. Point of error two is overruled.

■ Gill Savings' next five points of error concern the trial court's award of $144,309 in actual damages. This amount was based on the court's findings that Gill Savings caused Chair King to incur damages of $144,309, that Gill Savings caused Chair King to lose profits of $144,309 and that $144,309 would compensate Chair King for damages resulting from being deprived of its right to occupy, use and enjoy its leased premises. Gill Savings attacks this award on several grounds, including the sufficiency of evidence of lost profits and mitigation and the admission of both an expert's report and summaries of sales and expenses from the West Oaks Central store.

Chair King's allegations of damages encompassed a variety of items including increased costs of operations, impairment of capital value, lost net profits, loss of credit and costs associated with the trespass and conversion (specifically damage to the inventory that was removed and stored). The alleged damages totalled $2,102,626. The trial court's award bears no relation to that amount nor does it approximate any figure presented at trial. Even Chair King is hard-pressed to explain how the court arrived at the $144,309 figure.

When the parties reconvened to hear the court's verdict, the judge first sought information from Marvin Barish about the value of the property that was removed and stored, making it appear that her award would be based, at least in part, on the alleged damage to that property. She took a brief recess and then made the following pronouncement:

> The total actual damages that I have figured up, and that I believe that he actually suffered, and as a result of this act by Gill Savings coming in and locking you out, and taking your property, and that I believe that you suffered as a direct result of their actions, and the total of actual damages is a hundred and forty-four thousand three hundred and ninety dollars.

The judge also stated that she had "broken it down to where I can explain how I came up with these oddball figures" and indicated she would explain her calculations in her findings of fact and conclusions of law. According to appellant, she did not prepare her own findings and conclusions, however,

but instead signed some prepared by Chair King. There is thus no explanation of her figures.

Chair King's expert testified that the company's lost profits and expenses from May 1987 through the time of trial in February 1988 were $253,116 and $62,377, respectively. Future lost profits were calculated from March 1, 1988, through February 1998 at $1,787,134. If the trial court based her award solely on lost profits, the award bears no relation to these figures. In effect, although there is evidence of lost profits, the evidence does not support the award. The fact that the judge who tried this case is no longer in office prevents us from sending this case back for more detailed findings of fact. Therefore, we reverse the damages and remand that part of the case for the trial court to determine.

Relative to damages, Gill Savings also complains that the trial court erred in admitting the report of Chair King's expert into evidence, as well as summaries of sales and expenses from the West Oaks Central store. This should be addressed by the judge who will determine the damages. Gill Savings further argues that the trial court's findings and conclusions relating to mitigation of damages are not supported by sufficient evidence. Again, this will be an evidentiary issue to be considered on re-trial. Therefore, points of error three, four, five and seven are overruled, while point of error six regarding the factual sufficiency of the evidence to support lost profits is sustained.

In point of error eight, Gill Savings argues that the trial court erred in holding in favor of Chair King because there is no evidence or, alternatively, insufficient evidence of at least one element of each cause of action pled by Chair King. However, the award for fraud and estoppel has been upheld and provides a predicate for an award of actual damages. *See McAllen State Bank v. Linbeck Constr. Corp.*, 695 S.W.2d 10, 21 (Tex.App.—Corpus Christi 1985, writ ref'd n.r.e.). Point of error eight is overruled.

■ Gill Savings next maintains that the trial court erred in awarding exemplary damages in the amount of $355,227. Findings of actual damages and their amount are a necessary predicate for any finding of exemplary damages. *Luce v. Singdahlsen*, 636 S.W.2d 571, 575 (Tex.App.—Fort Worth 1982, writ ref'd n.r.e.). Since a determination of actual damages has been remanded, the exemplary damages will be redetermined as well. Point of error nine is sustained.

In point of error ten, Gill Savings argues that there is no evidence or, alternatively, insufficient evidence to support the trial court's award of attorney's fees to Chair King. The trial court awarded Chair King $62,662.50 in attorney's fees for trial of the case and $25,000 in the event of an appeal. This award was based entirely on the testimony of Chair King's attorney. He stated that his fees were $54,862.50 and that Chair King had paid $7,800 and $14,900 to other attorneys for services in the bankruptcy and temporary injunction proceedings. The attorney did not testify as to appellate fees. The trial court's award included the $54,862.50 and the $7,800 fees but not the $14,900 fees. Gill Savings raised several objections to this award.

■ It first asserts that attorney's fees are not allowed in a fraud case. Although the recovery in this case is in tort, an award of attorney's fees is permissible since there was a claim for and a finding of breach of contract, and the tort complained of arose out of that breach. *Wilson v. Ferguson*, 747 S.W.2d 499, 504 (Tex.App.—Tyler 1988, writ denied). Gill Savings also argues that Chair King's attorney did not segregate the time spent on causes of action in which attorney's fees are recoverable from those in which fees are not recoverable. However, when, as here, the causes of action involved in a suit are dependent upon the same set of facts or circumstances and thus are intertwined to the point of being inseparable, the party suing for attorney's fees may recover even though under one or more of the causes of action such fees are not recoverable. *Village Mobile Homes, Inc. v. Porter*, 716 S.W.2d 543, 552 (Tex.App.—Austin 1986, writ ref'd n.r.e.).

Gill Savings next contests the $7,800 awarded for the fees expended in the bankruptcy proceedings and the $25,000 awarded for the possible appeal of this case. No one from the firm that charged $7,800 for handling the bankruptcy matter testified in support of those fees. Barish testified that the fees were paid, and his attorney testified that they were reasonable and necessary. Chair King argues that the trial court also took judicial notice of the fees under TEX.CIV.PRAC. & REM. CODE ANN. § 38.004 (Vernon 1986). However, since attorney's fees relating to bankruptcy proceedings do not fall within § 38.001, judicial notice, if taken, was improper. *See Kaiser v. Northwest Shopping Center, Inc.*, 544 S.W.2d 785, 788 (Tex.Civ.App.—Dallas 1976, no writ). As the $7,800 has no support in the evidence, the judgment is modified to delete those fees. As there was no evidence to support the award for future appellate services, the judgment will also be reformed to delete that fee of $25,000. *Chrysler Corp. v. Schuenemann*, 618 S.W.2d 799, 807 (Tex. App.—Houston [1st Dist.] 1981, writ ref'd n.r.e.). Except for the reductions of $7,800 and $25,000, the award of attorney's fees is affirmed. Point of error ten is sustained in part and overruled in part.

In point of error eleven, Gill Savings complains of the trial court's refusal to allow its expert witnesses to testify while allowing Chair King's expert to do so. This complaint arose primarily due to the sequence of events that occurred once the case was remanded from the bankruptcy court on November 21, 1987. On December 4th, Chair King filed an amended petition alleging multiple causes of action and five separate counts of damages. On December 7th, Chair King filed interrogatories requesting, among other things, the identity and opinion of expert witnesses. Gill Savings maintains that it could not respond until it knew the identity of Chair King's expert witnesses. Meanwhile, trial was set for February 16, 1988, a fact that Gill Savings asserts it discovered by accident on January 4th. Gill Savings immediately sent interrogatories to Chair King. Chair King orally disclosed its expert during a deposition on January 15th and in writing on January 21st. Gill Savings then verbally designated its experts on the 19th and in writing on the 22nd.

A party is required to supplement discovery not less than thirty days prior to trial. TEX.R.CIV.P. 166b(6). Failure to supplement according to Rule 166b(6) automatically results in loss of the opportunity to offer the testimony. TEX. R.CIV.P. 215(5). However, Rule 215(5) gives the trial court discretion to admit the testimony for good cause, and the court's determination of good cause can be set aside only if that discretion is abused. *Morrow v. H.E.B., Inc.*, 714 S.W.2d 297, 297–98 (Tex.1986). Obviously, Gill Savings got caught in a time crunch, but once it had notice of the amended petition and the damages sought, there was no reason to delay finding experts and responding to Chair King's interrogatories. The need to do so became urgent on January 4th when Gill Savings learned of the trial setting. Since Gill Savings did have time to designate its expert witnesses, the court did not abuse its discretion in refusing to allow them to testify. Point of error eleven is overruled.

Lastly, Gill Savings asserts that the trial judge's prejudical and partisan attitude caused her to render an improper judgment in this case. Gill Savings cites as harmful the accumulation of the errors previously discussed, numerous other procedural errors committed by the trial court to Gill Savings' detriment and her intense questioning of Gill Savings' witnesses. Gill Savings actually acquiesced to the questioning at least once when the court apologized for interrupting one defense witness with questions. Counsel's response was "Please, Judge, you're making as much progress as I could." The trial court also encouraged the parties to object when they thought she was asking an improper question. A review of the entire statement of facts shows that, while her methods were somewhat unorthodox, the trial court did not prejudice Gill Savings' case to the extent that harmful error occurred. Point of error twelve is overruled.

The judgment as to liability is affirmed; the judgment is modified to delete $32,800 in attorney's fees; and the damage award is remanded for a new trial.