**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**
_____

No. 97-20199
Summary Calender
_____


MEX-TEX FEEDS, INC; DARRELL HALL

        Plaintiffs-Appellants,

   v.

CARGILL INCORPORATED

        Defendant-Appellee


DARRELL HALL; MEX-TEX FEEDS INC

        Plaintiffs - Counter Defendants - Appellants

    v.

CARGILL INCORPORATED, ET AL

        Defendants

CARGILL INCORPORATED

        Defendant - Counter Claimant - Appellee

_____

Appeal from the United States District Court
for the Southern District of Texas
(H-95-CV-292)
_____

March 26, 1998

Before JONES, SMITH, and STEWART, Circuit Judges.

JERRY E. SMITH, Circuit Judge:[*]


Mex-Tex Feed, Inc. ("Mex-Tex"), and Darrell Hall appeal a judgment as a matter of law ("j.m.l.") and an award of attorney's fees and costs. Finding no error, we affirm.


I.

This diversity case, removed from state court, arises from the death of several dairy cows in Aguascalientes, Mexico, on July 4, 1994. The central question is whether Mex-Tex introduced sufficient evidence indicating that the deaths were caused by defective feed supplied by defendant Cargill, Incorporated ("Cargill").


A.

In 1992, Mex-Tex and its owner, Darrell Hall, signed an agreement to purchase cattle feed manufactured by Cargill, then transport and resell it to dairy farmers in Mexico. The feedSSa liquid supplement called "Synergy 20/20"SSderived its name from the respective percentages of fat and protein (in the form of urea) in the mixture. Mex-Tex's sales of Synergy 20/20 to Mexican farmers began in early 1993.

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

Mex-Tex soon fell behind in its payments to Cargill. In early 1994, Hall signed a promissory note to Cargill securing a personal guaranty he had previously made. Although feed sales continued, Mex-Tex remained in arrears. Finally, in December 1994, Cargill demanded payment, triggering the instant lawsuit, filed by Mex-Tex and Hall in January 1995.

Mex-Tex charged that Cargill had supplied it with defective cattle feed that caused the cows' deaths.[1] Mex-Tex alleged that word of the deaths had spread quickly through the Mexican dairy farming community and that, as a result, no farmers would buy Synergy 20/20 from Mex-Tex, and its business collapsed. The flaw in the feed, Mex-Tex argued, was separation: The fat content rose to the top of the mixture in the tank, while the urea content (potentially dangerous, in pure form, to the bovine system) sunk to the bottom. According to Mex-Tex, when the cattle were fed from spouts at the bottom of the tank, they ingested excessive urea, causing sickness, then death. Mex-Tex contended that Synergy 20/20 was defective in that its chemical composition was prone to separation when used in a humid climate (such as Mexico's) or when transported over long distances (such as when shipped from Texas to Mexico). Mex-Tex concluded that the feed did in fact separate, causing the deaths.

---

[1] Although Mex-Tex had been selling Synergy 20/20 in Mexico for about 1½ years, this was apparently the firstSSand onlySSreported problem with the product.

B.

Mex-Tex premised its suit on a variety of legal theories, alleging breach of contract, fraud, negligence, gross negligence, and violation of the Texas Deceptive Trade Practices Act ("DTPA"). Cargill then counterclaimed for the balance due under the promissory note and to collect payments due under outstanding invoices.

The matter was tried to a jury in January 1997. At the close of Mex-Tex's case, the court granted Cargill's motion for j.m.l. on all claims, finding that Mex-Tex had failed to introduce evidence establishing that the chemical composition of Synergy 20/20 was defective and that this defect caused the cows' deaths. The court also granted Cargill j.m.l. on its counterclaim and awarded attorney's fees and costs to Cargill pursuant to a term in Hall's promissory note.

II.

We review a j.m.l. *de novo*, applying the same legal standard employed by the district court. *Murray v. Red Kap Indus., Inc.*, 124 F.3d 695, 697 (5th Cir. 1997). The entry of j.m.l. is appropriate if, after considering the evidence presented and viewing all reasonable inferences in the light most favorable to the non-moving party, no rational jury could render a verdict for the nonmovant. *Id*; FED. R. CIV. P. 50(a). But j.m.l. is

4

inappropriate when substantial evidence of such quality and weight exists so that reasonable and fair-minded jurors might reach a different conclusion. *London v. MAC Corp. of Am.*, 44 F.3d 316, 318 (5th Cir. 1995).

The district court granted j.m.l. because it found that Mex-Tex had failed to introduce evidence showing that, as of July 4, 1994, Synergy 20/20 was defective because of a flawed chemical composition. Without establishing that some sort of defect in the product caused the deaths, Mex-Tex's various claimsSSfor breach of contract, negligence, fraud, and violation of the DTPASScould not stand.[2]

In determining whether j.m.l. was proper, we must examine the evidence Mex-Tex introduced at trial. First, it offered lab reports performed on samples of Synergy 20/20 drawn by Cargill's employee, John Spears. One sample suggested that the feed may have separated.[3] But as the district court noted, these lab reports were not evidence that the product was defective. The feed may have separated because of tampering, because of poor handling by the farmers themselves, or because rainwater leaked into the tanks.

---

[2] In its effort to prove breach of contract, Mex-Tex claims it received something it did not bargain forSSdefective feed (that is, feed that separated), rather than good feed (that is, feed that did not separate). To establish fraud and a deceptive trade practice, Mex-Tex claims that Cargill did not tell Mex-Tex that its feed could separate. In short, all of Mex-Tex's causes of action boil down to the question whether there was some sort of flaw or defect in the chemical composition of Synergy 20/20 that led to separation.

[3] Mex-Tex does not specify precisely when this alleged separation occurred. The district court explicitly found that when the Synergy 20/20 left the factory, it was manufactured to the standards set in the product specifications.

Moreover, many of the samples relied upon for the lab reports were taken on July 13, nine days after the deaths.

In short, the lab results did not suggest that the *chemical composition* of Synergy 20/20 was flawed in that the feed was susceptible to separation when hauled over long distances or maintained in humid climates.[4] The district court properly concluded that the lab reports did not speak to whether Cargill's product was defective.

Second, Mex-Tex offered testimony from Ramon Ortiz Gonzales ("Ortiz") and Martin Saldivar. Ortiz owns a veterinary supply company in Aguascalientes that bought Synergy 20/20 from Cargill; Saldivar is a veterinarian employed by Ortiz. Both testified that they observed ill cows and that they believed the illness was caused by bad feed. This evidence may support Mex-Tex's theory that the cows ate the Synergy 20/20 and subsequently became ill, but it does not indicate that the product caused the illness, norSSif the feed indeed was to blameSSthat its chemical composition was defective.

Third, Mex-Tex presented Robert Albin, an expert witness who had studied the lab reports on the Aguascalientes samples and testified that the feed theoretically could separate with heat or over time. He stated that he compared samples taken from tanks on

---

[4] The district court also found that the lab reports showed different results among different tanks, suggesting the likelihood of tampering rather than a flaw in the chemical composition that would have produced more uniform results.

July 4 and July 13 and found that the chemical compositions differed.  Albin further stated that none of the samples he examined contained lethal levels of urea and that the cows' carcasses were not tested to determine whether the deaths were caused by ingesting excessive urea.  Albin's testimony falls far short of being probative as to whether the Synergy 20/20, as of July 4, had separated into a lethal mixture because of an inherently defective chemical composition.

As the district court noted, in the absence of testing the dead cows and of proof as to whether the separation (if it even occurred) was caused by a defective chemical composition, Mex-Tex cannot prevail.  Mex-Tex failed to introduce more than speculative evidence that the feed the cows consumed on July 4 had separated as a result of a product defect.  Because Mex-Tex did not offer probative evidence on this crucial point, j.m.l. was proper.


III.

Mex-Tex also appeals the j.m.l. on the counterclaim, arguing that because the feed was defective, it was under no obligation to pay the money it owed Cargill under the contract.  But because we have concluded that Mex-Tex failed to introduce evidence establishing a defect, its defense evaporates, so j.m.l. was appropriate.


IV.

7

Mex-Tex contends that the district court erred in awarding Cargill attorney's fees and costs. We review for abuse of discretion. *Nickel v. Estate of Estes*, 122 F.3d 294, 301 (5th Cir. 1997).

The promissory note provides: "[I]f suit is brought to collect this Note, the holder shall be entitled to collect all reasonable costs and expenses of suit, including, but not limited to, reasonable attorney's fees." Mex-Tex argues that Cargill is not entitled to costs and fees stemming from the "tort" lawsuit, because Mex-Tex's tort claim is distinct from Cargill's breach of contract counterclaim.

The problem with this argument is that the central issue on both the claim and the counterclaim is whether the Synergy 20/20 separated. In order to prosecute its breach of contract action, Cargill needed to confront the question whether its product was defective; in fact, Mex-Tex's defense to the breach of contract counterclaim was that Cargill's goods were flawed.

Texas courts have consistently held that "when the causes of action involved in the suit are dependent upon the same set of facts or circumstances and thus are 'intertwined to the point of being inseparable,' the party suing for attorney's fees may recover the entire amount covering all claims." *Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1, 11 (Tex. 1991) (quoting *Gill Sav. Ass'n v. Chair King, Inc.*, 783 S.W.2d 674, 680 (Tex. App.§§Houston [14th

8

Dist.] 1989), *modified*, 797 S.W.2d 31 (Tex. 1990)).  In seeking to segregate the two lawsuits, Mex-Tex draws too fine a distinction.  The district court did not abuse its discretion in awarding attorney's fees and costs.

AFFIRMED.