MEMORANDUM OPINION


No. 04-03-00926-CV

SHADOW DANCE RANCH PARTNERSHIP, LTD.;
Shadow Dance Ranch Management Company, Inc.; and
Brian Weiner,
Appellants

v.

Gordon WEINER,
Appellee

From the 216th Judicial District Court, Bandera County, Texas
Trial Court No. 8147-01
Honorable Stephen B. Ables, Judge Presiding
 
Opinion by:    Sarah B. Duncan, Justice
 
Sitting:            Alma L. López, Chief Justice
Sarah B. Duncan, Justice
Phylis Speedlin, Justice
 
Delivered and Filed:   December 7, 2005 

AFFIRMED
            Shadow Dance Ranch Partnership, Ltd. (“the Partnership”); the Partnership’s general partner
Shadow Dance Ranch Management Company, Inc. (“the Management Company”); and the chairman
of the Management Company’s board of directors and its chief executive officer, as well as a limited
partner of the Partnership, Brian Weiner, appeal the trial court’s judgment declaring that the
Partnership’s other limited partner, Brian’s brother Gordon, “became entitled to dissolve [the
Partnership] on June 25, 2001, under Article VII of the First Amended and Restated Agreement of
Limited Partnership Of [the Partnership]” (“the Agreement”); the Partnership “dissolved on June 25,
2001, and has subsequently existed only for the limited purpose of being liquidated with reasonable
promptness, pursuant to Article VII of [the Agreement]”; the Partnership and the Management
Company “took no action whatsoever to liquidate” the Partnership; and Gordon is “the prevailing
party” and entitled to recover his attorney’s fees in accordance with the jury’s verdict. We affirm the
trial court’s judgment.
Factual and Procedural Background
            On January 19, 1990, brothers Brian and Gordon Weiner entered into the Shadow Dance
Ranch Partnership, a general partnership organized for the purpose of owning and operating the
Shadow Dance Ranch. On February 15, 1991, Brian and Gordon entered into the Agreement, which
provides that the general partnership would be converted into a limited one, with Brian and Gordon
each contributing his interest in the Ranch and receiving in exchange a 49.5% ownership interest and
the Management Company contributing $15,798 and receiving in exchange a 1% ownership interest.



Capital Calls
            So that the Management Company would have sufficient funds to maintain the Ranch and
operate its business, paragraph 4.3 of the Agreement provides that each partner is “obligated to
contribute additional capital to the Partnership beyond their initial capital contributions upon demand
of the General Partner, in its sole discretion ....” If a “Partner [was] unable or unwilling to make any
or all of his proportionate contribution within thirty (30) days after [it became] due,” paragraph 4.4
provides that the remaining partners could make the defaulting partner’s contribution for him and,
within thirty days after the default, elect to treat the contribution as either (A) a loan to the defaulting
partner or (B) additional capital to be allocated to the paying partner’s capital account. If the paying
partner elected to treat the contribution as additional capital, paragraph 4.4(i) provides that the
partners’ ownership percentages would be adjusted accordingly. 
            Without reference to paragraph 4.4, paragraph 6.2 of the Agreement provides that, “[i]f any
Partner is unable or unwilling to make any or all of his proportionate additional contributions,” it is
deemed a “Terminating Event”; and “such Partner shall be deemed as of the date of occurrence of
such event to have made an offer to sell the entire interest of such Partner in this Partnership and the
Property to the other Partners, who shall have the right to purchase the same on the terms hereinafter
provided.” If the partners could not agree on a purchase price for the defaulting partner’s interest
“within sixty (60) days after the event triggering the purchase,” then the purchasing partners were
required to deliver to the selling partner a “notice requiring that an appraiser be appointed ....” If the
partners were unable to agree on an appraiser within thirty days after delivery of the notice, the
purchasing partners and the selling partner would “each have the right to appoint one appraiser, and
the two appraisers so appointed shall then agree upon a third appraiser to be appointed.” 
Marriage Addendum
            The Agreement also provides that if Gordon should marry during the Agreement’s term, he
would “use his best efforts to obtain his spouse’s signature on an addendum to [the] Agreement
evidencing that her community interest, if any, in and to any of his interest in the Partnership is
subject to the terms and provisions of [the] Agreement in all respects ....” If Gordon was unable to
obtain the signed addendum, his “marriage shall be treated as if it were an involuntary termination
of his interest effective as of the day immediately preceding his marriage.” It is undisputed that
Gordon married on August 4, 1991; and, on January 10, 1995, his wife signed a post-nuptial
agreement disclaiming any interest in Gordon’s partnership interest. 
Notice of Dissolution
            By April 1999, Gordon’s personal savings were depleted. Rather than go into debt to meet
future capital calls, Gordon ceased paying capital calls in March 1999, declined to pay any further
calls, and stopped performing his duties as president of the Management Company. Brian assumed
the duties of president, paid Gordon’s proportionate share of the capital calls, and elected to treat the
contributions as additional capital to be allocated to his account. As a result, Gordon’s initial 49.5%
partnership interest was reduced to 39.3%, while Brian’s increased to 59.9%.
            So things stood on April 26, 2001 when Gordon paid the Management Company, and the
Management Company accepted, $12,754.17, representing the March and April 2001 capital calls,
and sent a notice of dissolution pursuant to paragraph 7.1, which provides that “[a]ny Partner ... shall
have the power to cause the dissolution of the Partnership by giving sixty (60) days prior written
notice to the other Partners of said Partner’s intention to dissolve the Partnership ....” Shortly
thereafter, on May 9, 2001, the Management Company demanded payment of an unprecedented
$268,158 capital call. Gordon paid this capital call with a cashier’s check, which the Management
Company accepted and cashed without comment. 
            Pursuant to paragraph 7.1, dissolution was to occur on June 25, 2001. However, on June 21,
2001, the Management Company – for the first time in six years – asked Gordon for the marital
addendum required by paragraph 5.4 of the Agreement. The following day Gordon forwarded to the
Management Company not only the marital addendum but a copy of the post-nuptial agreement
signed by his wife six years earlier. On June 25, 2001, the date dissolution was to occur under
paragraph 7.1, the Management Company notified Gordon by letter that it and Brian considered
Gordon’s notice of dissolution ineffective. When Brian and the Management Company refused to
liquidate the Partnership and wind up its affairs, Gordon sued them and the Partnership for breach
of contract, as well as a declaratory judgment seeking to enforce the Agreement’s requirements
concerning dissolution, winding up, and liquidation. 
            The crux of the parties’ dispute is the interpretation of the Partnership Agreement and
specifically the interplay between paragraphs 6.2(f) and 7.1(b), which provide as follows:
6.2(f) If a “Partner is unable or
unwilling to make any or all of his
proportionate additional capital
contributions,” that “Partner shall be
deemed ... to have made an offer to
sell the entire interest of such Partner
in this Partnership and the Property to
the other Partners.”

7.1(b) “Any Partner ... shall have the
power to cause the dissolution of the
Partnership by giving sixty (60) days
prior written notice to the other
Partners of said Partner’s intention to
dissolve the Partnership ....”
 

Appellants (hereinafter referred to as “Brian”) argue that “[a] partner desiring to dissolve the
Partnership without risking a buy-out of his interest may do so by fulfilling his obligations under the
Agreement and, therefore, not creating any deemed offers to sell.” Brian thus argues we should
“harmonize” articles VI and VII “by holding that any partner may give notice of intent to dissolve
under Article VII, but if that partner is in default of the Agreement, or subsequently defaults, the
remaining partners may still exercise their buy-out rights under Article VI.” Gordon argues that his
right to call for dissolution under paragraph 7.1 was unconditional. The Agreement does not address
whether the buy-out right provided by paragraph 6.2 survives a notice of intent to dissolve; and there
is no direct or circumstantial evidence regarding the parties’ intent when they entered the Agreement.
            The trial court concluded the Agreement is ambiguous and submitted its interpretation to a
jury, which unanimously found that Gordon was entitled to dissolution under article VII, despite the
undisputed fact that he had been “unable or unwilling to make any or all of his proportionate
additional capital contributions” and thus was “deemed ... to have made an offer to sell [his] entire
[partnership] interest.” After the trial court rendered judgment on the jury’s verdict in Gordon’s
favor, Brian appealed. 
Discussion
            1.         Brian first asks whether the Agreement is ambiguous, a question of law that we
review de novo. See J.M. Davidson, Inc. v. Webster, 128 S.W.3d 223, 229 (Tex. 2003). Like the trial
court, we conclude the Agreement is ambiguous. Paragraph 7.1 affords a partner the right to cause
dissolution by sending the required notice, while paragraph 6.2 affords a partner the right to purchase
a defaulting partner’s interest in the Partnership. Neither paragraph 7.1 nor paragraph 6.2 references
the other; nor does either of these provisions – or any other provision in the Agreement – address
how these provisions are to operate when both are invoked simultaneously. The Agreement’s failure
to address this situation presents a classic “latent” ambiguity; and we so hold. See Nat’l Union Fire
Ins. Co. of Pittsburgh, PA v. CBI Indus., Inc., 907 S.W.2d 517, 520 (Tex. 1995) (“A latent ambiguity
arises when a contract which is unambiguous on its face is applied to the subject matter with which
it deals and an ambiguity appears by reason of some collateral matter.”); see also Donahue v.
Bowles, Troy, Donahue, Johnson, Inc., 949 S.W.2d 746, 753 (Tex. App.–Dallas 1997, writ denied)
(holding that buy-sell agreement was ambiguous because it “sa[id] nothing one way or the other
about a right to reappraise the shares in light of new information” and thus made it “impossible to
determine which of the two appraisals should be used to determine the value of Donahue’s shares”).
Because the interplay between paragraphs 6.2 and 7.1 renders the Agreement ambiguous in the
circumstances presented by Gordon’s and Brian’s dispute, the trial court properly submitted its
interpretation to the jury.



            2.         Brian next asks whether the evidence is legally and factually sufficient to support the
jury’s finding that Gordon was entitled to dissolution under article VII of the Agreement “despite
his failure to obtain the marital addendum and/or make capital calls prior to April 26, 2001.”
Because the material facts are undisputed, however, the only issue for the jury to decide was one of
the parties’ intent: whether Gordon’s failure to provide the marital addendum and missing capital
calls before he sent notice of his intent to seek dissolution deprived him of the right to call for
dissolution. As noted above, nothing in the Agreement makes the right to call for dissolution
dependent upon meeting all capital calls; nor does any provision in the Agreement make the right
to call for dissolution dependent upon providing the marital addendum. And there is no direct or
circumstantial evidence suggesting that the parties intended at the time they entered the Agreement
to make the right to call for dissolution dependent upon either. There was thus very little evidence
on the contract interpretation issue for the jury to consider. But what little evidence there is supports
the jury’s finding. Gordon testified that once he sent the dissolution notice, the paragraph 6.2 buy-out
procedure was no longer available; had it been, he would not have paid the unprecedented Spring
2001 capital call of $268,158. See Consol. Eng’g Co. v. S. Steel Co., 699 S.W.2d 188, 192-93 (Tex.
1985) (holding evidence of parties’ conduct under agreement may be considered in determining
parties’ intent). Moreover, as Gordon argues, Brian’s interpretation of the interplay between
paragraphs 6.2 and 7.1, “[t]aken to its logical conclusion,” “would ... allow Brian to ignore
dissolution notices indefinitely and continue to demand capital until Gordon’s ownership interest is
eliminated.” Brian’s construction of the Agreement would thus produce an unjust, unreasonable, and
oppressive result. See Reilly v. Rangers Mgmt., Inc., 727 S.W.2d 527, 530 (Tex. 1987) (noting that
unjust, unreasonable, or oppressive construction is disfavored). We therefore hold the evidence is
legally and factually sufficient to support the jury’s finding.
            3.         Brian next asks whether “Gordon’s notice of intent to dissolve the Partnership [was]
superseded and rendered ineffective by [Brian’s] acceptance of Gordon’s deemed offers to sell his
entire partnership interest.” We hold that it was not for the simple reason that there is no evidence
that, before Gordon sent his notice of dissolution on April 26, 2001 or within sixty days of a
“terminating event,” Brian invoked the paragraph 6.2 procedures in any way. It is undisputed that
Brian did not give oral or written notice appointing an appraiser, as required by paragraph 6.2, until
November 8, 2001 – long after Gordon had sent his notice of dissolution and made his last capital
contribution. Brian’s June 21, 2001 letter informing Gordon that he was exercising his right pursuant
to paragraph 6.2 for Gordon’s “repeated” failure to provide the marital addendum is not evidence
of Brian’s acceptance of a deemed offer to sell because the letter was sent more than sixty days after
the alleged terminating event and was not sent until after the notice of dissolution. Moreover, Brian
failed to pursue the right he claimed in the June 21, 2001 letter by timely requiring the appointment
of an appraiser. It is also undisputed that Brian did not expressly reference, in writing, paragraph 6.2
as the provision under which he accepted Gordon’s deemed offers to sell for failing to make a capital
call until he sent Gordon a letter informing him of this fact on September 19, 2001 – after Gordon
sent his notice of dissolution and more than sixty days after any “terminating event” that preceded
the notice of dissolution.
            Brian argues, however, that the Agreement does not require formal acceptance; therefore, the
offers his attorney made throughout 1999, 2000, and 2001 to Gordon’s attorney to purchase
Gordon’s partnership interest constitute evidence that he accepted Gordon’s deemed offers to sell.
However, these offers were in fact offers to settle a lawsuit related to the sale of the domestic
operations of the family’s magazine distribution business, not offers to purchase Gordon’s
partnership interest pursuant to the provisions of paragraph 6.2 of the Agreement. And even if they
were offers to purchase Gordon’s partnership interest, Brian’s construction of the Agreement is
untenable since it would make it impossible to determine the date on which a partner accepted a
deemed offer to sell and consequently the date on which paragraph 6.2’s buy-out procedures were
triggered. As this case so aptly demonstrates (and indeed as common sense dictates), if the
Agreement were construed as not requiring that an acceptance be explicitly communicated and acted
upon in a timely manner, the partners would not know with assurance whether or when paragraph
6.2’s buy-out procedure had been triggered. We also fail to discern how Brian’s decision to cover
Gordon’s missed capital calls (and thereby increase his share in the Partnership) could be interpreted
as an indication of an intent to trigger paragraph 6.2’s buy-out provisions; indeed, this conduct is
more indicative of a rejection of the paragraph 6.2 buy-out procedures. See Consol. Eng’g Co., 699
S.W.2d at 192-93 (holding the parties’ conduct under an agreement is instructive in discerning their
true intent). Accordingly, we hold Gordon’s notice of dissolution was not superseded or rendered
ineffective by Brian’s acceptance of a deemed offer to sell.
            4.         Brian next argues the trial court erred in refusing to submit to the jury what he
characterizes as the following “controlling issues”: (a) equitable estoppel, (b) section 8.01 of the
Texas Revised Limited Partnership Act, and (c) Brian’s acceptance of Gordon’s deemed offers to
sell. We disagree.
            The court’s charge asked the jury the following broad-form question:
Do you find from a preponderance of the evidence that Gordon Weiner was
entitled to dissolution under Article VII of the Shadow Dance Ranch Partnership
Agreement despite his failure to obtain the marital addendum and/or make capital
calls prior to April 26, 2001?

In answering this question, the jury was instructed as follows:
 
It is your duty to interpret the entirety of Articles VI and VII of the Shadow
Dance Ranch Partnership Agreement. You must decide their meaning by determining
the intent of the parties at the time of the agreement. Consider all the facts and
circumstances surrounding the making of the agreement, the interpretation placed on
the agreement by the parties, and the conduct of the parties.

This question subsumes each of Brian’s pleaded defenses that are supported by some evidence. See
Tex. R. Civ. P. 278; Triplex Commc’ns, Inc. v. Riley, 900 S.W.2d 716, 718 (Tex. 1995) (“[i]f an
issue is properly pleaded and is supported by some evidence, a litigant is entitled to have controlling
questions submitted to the jury”). 
                        a.         Equitable estoppel – As Brian recognizes, one of the elements of equitable
estoppel is detrimental reliance on a false representation or concealment of a material fact. Johnson
& Higgins of Texas, Inc. v. Kenneco Energy, Inc., 962 S.W.2d 507, 515 (Tex. 1998). Brian argues
the record contains some evidence on this element because he “relied to [his] detriment on Gordon’s
charade of negotiating for a buy-out and his silence regarding his true intention to dissolve the
Partnership by refraining from pursuing [his] rights under [paragraph] 6.2.” According to Brian, “had
[he] known of Gordon’s intention to destroy the Partnership, [he] would have explicitly accepted
Gordon’s deemed offers to sell, demanded appointment of an appraiser, and enforced [his] right to
purchase his interest under the agreement.” However, this assertion is belied by Brian’s arguments
that Gordon’s failure to timely provide the marital addendum and missed capital calls constituted
deemed offers to sell, which Brian vigorously argues he did accept, and the undisputed fact that
Brian took no formal action to timely invoke the paragraph 6.2 procedures. If, as Brian argues, the
Agreement does not require that a deemed offer to sell be formally accepted, Gordon’s behavior
could not possibly have prevented Brian from accepting the offers he argues he had already accepted.
Moreover, there is no evidence that Gordon was engaged in a “charade” to hide his true intentions
to preclude Brian from exercising his buy-out rights. Indeed, as Brian characterizes it, he negotiated
a buy-out for three years. When it became evident that negotiations were proving unsuccessful,
Brian, a sophisticated businessman represented by counsel, could have forced the issue merely by
sending notice of the appointment of an appraiser pursuant to paragraph 6.2. The fact that he could
have done so and did not because Gordon wanted to continue negotiating does not constitute
evidence that Gordon falsely represented or concealed a material fact. At some point, the onus was
upon Brian to act. He simply failed to do so.
                        b.         Section 8.01 – Brian next argues the trial court erred in refusing to submit a
question asking whether “Brian Weiner and Shadow Dance Ranch Management Company agree[d]
in writing no later than 90 days following Gordon Weiner’s notice of dissolution to continue the
business of Shadow Dance Ranch Partnership, Ltd.” Brian argues he was entitled to submission of
this question to establish that Gordon’s notice of dissolution did not dissolve the Partnership under
section 8.01 of the Texas Revised Limited Partnership Act, which provides as follows:
A limited partnership is dissolved and its affairs shall be wound up only on the first
of the following to occur:
 
(1)the occurrence of events specified in the partnership agreement to cause
dissolution unless within 90 days after the event causing the dissolution, all
remaining partners (or another group or percentage of partners as specified by the
partnership agreement) agree in writing to continue the business of the limited
partnership.

Tex. Rev. Civ. Stat. Ann. art. 6132a-1, § 8.01 (Vernon Supp. 2005). However, as Gordon points
out, the accompanying commentary provides that, “[i]f the agreement provides that dissolution
occurs on a date certain, then dissolution takes place on that date under Section 8.01(1).” Id. cmt.
            Paragraph 7.1 of the Agreement provides that “[a]ny Partner ... shall have the power to cause
the dissolution of the Partnership by giving sixty (60) days prior written notice to the other Partners
of said Partner’s intention to dissolve the Partnership ....” We hold this paragraph provides that
dissolution was to occur on a “date certain” – sixty days after Gordon’s April 26, 2001 notice of
dissolution or June 25, 2001; therefore, it is irrelevant whether the remaining partners timely agreed
in writing to continue the business. But even if this were not true, there is simply no evidence of such
an agreement. Brian argues an agreement is reflected in the Management Company’s June 25, 2001
letter to Gordon. This letter states in full as follows:
Dear Gordon:
 
We are in receipt of [your June 22, 2001 letter enclosing the marital addendum and
Post-Nuptual Agreement and expressing that you “continue to look forward to and
expect the prompt liquidation and wind-up [of] the business of the Partnership in
accordance with the terms of the Partnership Agreement on the Dissolution Date” of
June 25, 2001.]
 
Since the General Partner and the other Limited Partner of Shadow Dance Ranch
Partnership, Ltd. have exercised their option to purchase your limited partnership
interest in the Partnership and the Property, we believe your notice of intention to
dissolve dated April 26, 2001 is ineffective.

But this letter clearly does not satisfy the requirements of section 8.01: it is signed not by the
remaining partners but only by Brian in his capacity as the Management Company’s chief executive
officer; and it does not state that the remaining partners had agreed in writing to continue the
business. Although Brian testified at trial that he intended this letter to signify the remaining
partners’ intent to continue the business, their intent is irrelevant under section 8.01, which plainly
requires a written agreement signed by the remaining partners to continue the business. Because the
record does not contain any evidence of such an agreement, the trial court did not err in refusing to
submit Brian’s request to submit a question asking if they had so agreed.
                        c.         Deemed Offers – Brian next argues the trial court erred in refusing to submit
a question asking whether he accepted Gordon’s deemed offer to sell. Brian argues this issue was
raised by his September 19, 2001 letter notifying Gordon that Brian accepted Gordon’s deemed offer
to sell arising out of Gordon’s failure to pay his share of the August 1, 2001 capital call and his
subsequent letter notifying Gordon of the need to appoint an appraiser pursuant to paragraph 6.2.
However, this evidence establishes that Brian attempted to accept Gordon’s deemed offers to sell
after Gordon’s April 26, 2001 dissolution notice. And whether the Agreement permitted the
acceptance of a deemed offer to sell after a notice of dissolution was subsumed in the question the
jury was asked. If Brian were entitled under the Agreement to accept Gordon’s deemed offers to sell
after he sent notice of dissolution, the jury would have simply answered the broad-form question
“no” rather than “yes” and found that Gordon was not entitled to dissolution under article VII. 
            5.         Brian next argues “the trial court err[ed] in making fact findings (in the guise of
declarations) that are not supported by the jury’s verdict.” We disagree.
            The Uniform Declaratory Judgments Act provides that a person interested under a written
contract may have determined any question of construction or validity arising under the contract and
obtain a declaration of rights, status, or other legal relations under the contract. Tex. Civ. Prac. &
Rem. Code Ann. § 37.004(a) (Vernon 1997). Disputed issues of fact may be decided by a jury. Id.
§ 37.007. However, a trial court is not required to submit jury questions on uncontroverted issues
of fact. See Sullivan v. Barnett, 471 S.W.2d 39, 44 (Tex. 1971). Accordingly, in a declaratory
judgment action, a trial court may render declarations based not only on the jury’s resolution of
disputed facts but also on the undisputed evidence adduced at trial.
                        a.         Brian first argues the trial court incorrectly declared that the Partnership
“dissolved on June 25, 2001, and has subsequently existed only for the limited purpose of being
liquidated with reasonable promptness” because “whether the Partnership effectively dissolved 60
days after Gordon’s notice depends on the effect of the Management Company’s interim acceptance
of Gordon’s deemed offers to sell, Brian’s subsequent written acceptance and/or prior verbal
acceptance of another deemed offer to sell, and the [June 25, 2001] Section 8.01 letter.” However,
as discussed above in numbered paragraphs three and four, there is no evidence that Brian invoked
the procedure of paragraph 6.2 before Gordon’s April 26, 2001 dissolution notice; and, as we
discussed above in numbered paragraph four, the Management Company’s June 25, 2001 letter
informs Gordon that his dissolution notice was ineffective because the remaining partners allegedly
had already accepted Gordon’s deemed offers to sell, not because the remaining partners had agreed
in writing to continue the business. And, since the jury found Gordon was entitled to dissolve the
partnership on June 25, 2001, any alleged acceptance of a deemed offer to sell that occurred
subsequent to that date is irrelevant. Accordingly, the trial court properly declared the Partnership
“dissolved on June 25, 2001, and has subsequently existed only for the limited purpose of being
liquidated with reasonable promptness.” 
                        b.         Brian next argues the trial court erred in declaring that after June 25, 2001,
the Partnership and the Management Company took no action whatsoever to liquidate the
Partnership. However, this fact is undisputed and therefore a proper basis for the trial court’s
declaration.
                        c.         Finally, Brian argues the trial court erred in declaring that Gordon is a
prevailing party entitled to recover from the Partnership reasonable and necessary attorney’s fees in
the amounts determined by the jury. We address this issue below.
            6.         The trial court declared Gordon a prevailing party and awarded him his attorney’s fees
in accordance with the jury’s verdict without specifying the statutory basis for the award. In his last
issue, Brian argues the award of attorney’s fees constitutes an abuse of discretion. We disagree.
                        a.         Brian first argues the trial court abused its discretion in awarding Gordon his
attorney’s fees pursuant to the Declaratory Judgment Act because Gordon’s declaratory judgment
claim is subsumed within his claim for breach of contract damages. 
            “A declaratory judgment is appropriate only if a justiciable controversy exists as to the rights
and status of the parties and the controversy will be resolved by the declaration sought.” Bonham
State Bank v. Beadle, 907 S.W.2d 465, 467 (Tex. 1995). If a declaratory judgment is appropriate,
“the Declaratory Judgments Act entrusts attorney fee awards to the trial court’s sound discretion,
subject to the requirements that any fees awarded be reasonable and necessary, which are matters of
fact, and to the additional requirements that fees be equitable and just, which are matters of law.”
Bocquet v. Herring, 972 S.W.2d 19, 21 (Tex. 1998). But “[a] declaratory relief plea may not be
coupled to a damage action simply in order to pave the way to recover attorney’s fees.” Hartford
Cas. Ins. Co. v. Budget Rent-A-Car Sys., Inc., 796 S.W.2d 763, 772 (Tex. App.–Dallas 1990, writ
denied); see also Brosseau v. Ranzau, 81 S.W.3d 381, 397-98 (Tex. App.–Beaumont 2002, pet.
denied) (citing Kenneth Leventhal & Co. v. Reeves, 978 S.W.2d 253 (Tex. App.–Houston [14th
Dist.] 1998, no pet.)).
             We hold Gordon’s declaratory judgment action was not coupled with his breach of contract
action “simply in order to pave the way to recover attorney’s fees.” Rather, the declaratory judgment
action was necessary to completely resolve “the rights and status” of, and the controversy between,
Brian and Gordon regarding the consequences of the jury’s finding that Gordon was entitled to
dissolution under article VII: the Partnership “dissolved on June 25, 2001, and has subsequently
existed only for the limited purpose of being liquidated with reasonable promptness.” We therefore
hold Gordon is entitled to an award of attorney’s fees under the Declaratory Judgments Act.            b.         Brian also argues that Gordon is not entitled to his attorney’s fees because he failed
to segregate. 
            “In order to show the reasonableness and necessity of attorney’s fees, the plaintiff is required
to show that the fees were incurred while suing the defendant sought to be charged with the fees on
a claim which allows recovery of such fees.” Stewart Title Guar. Co. v. Sterling, 822 S.W.2d 1, 10
(Tex. 1991). However, “[a] recognized exception to this duty to segregate arises when the attorney’s
fees rendered are in connection with claims arising out of the same transaction and are so interrelated
that their ‘prosecution or defense entails proof or denial of essentially the same facts.’” Id. at 11
(quoting Flint & Assoc. v. Intercontinental Pipe & Steel, Inc., 739 S.W.2d 622, 624-25 (Tex.
App.–Dallas 1987, writ denied)). “Therefore, when the causes of action involved in the suit are
dependent upon the same set of facts or circumstances and thus are ‘interwined to the point of being
inseparable,’ the party suing for attorney’s fees may recover the entire amount covering all claims.
Stewart Title Guar. Co., 822 S.W.2d at 11 (quoting Gill Sav. Ass’n v. Chair King, Inc., 783 S.W.2d
674, 680 (Tex. App.–Houston [14th Dist.] 1989), aff’d in part and modified in part, 797 S.W.2d 31
(Tex. 1990)).
            We hold Gordon’s claims fall not within the general rule requiring segregation but within the
exception. As recognized by one of Brian’s attorneys, Brian’s fees were not capable of segregation
because the defense and prosecution of claims and counterclaims was so intertwined. The same must
necessarily be said about Gordon’s attorney’s fees.
            The trial court’s judgment is affirmed.
 
Sarah B. Duncan, Justice